UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
UNITED STATES OF AMERICA,

     -against-        22 CR 435 (LAP)

KEITA, et al.,

        Marquise Austin
        Defendant.
-----------------------------------------------------------x

**DEFENDANT MARQUISE AUSTIN'S MEMORANDUM OF LAW IN
SUPPORT OF HIS MOTION TO DISMISS**

  Defendant Marquise Austin ("Mr. Austin") respectfully moves this Court for an order dismissing the indictment against him, as it was obtained in violation of his Second Amendment rights, and such other and further relief as the Court deems just and proper.

  The Second Amendment to the United States Constitution confers an "individual right to keep and bear arms" for self-defense. *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). That enumerated right is "fundamental to our scheme of ordered liberty." *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (emphasis omitted). Courts therefore may not treat it "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Id.* at 780.

  Two years ago, the Supreme Court gave unequivocal guidance about how courts must interpret whether gun regulations are permissible under the Second Amendment. Rejecting lower courts' previous approach, which balanced

1

the strength of the government's interest in regulating gun ownership against the degree of infringement on an individual's Second Amendment rights, the Supreme Court instead directed courts to consider only the "constitutional text and history." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128-29 (2022). Under the Supreme Court's new approach, gun regulations are unconstitutional unless the government can prove that they are "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126. The burden is squarely on the government.

On March 11, 2022, Mr. Austin was arrested in Little Rock, Arkansas on allegations that he sold legally purchased guns to his co-defendants, who in turn transported those guns to New York City. On August 10, 2022, Mr. Austin was indicted by a federal grand jury on one count of gun trafficking and one count of conspiracy to traffic guns under 18 U.S.C. § 922(a)(1)(A). Section 922(a)(1)(A) makes it unlawful for any person who is not a licensed importer, manufacturer, or dealer of firearms "to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce." 18 U.S.C. § 922(a)(1)(A).

Section 922(a)(1)(A) burdens the fundamental right to self-defense protected by the Second Amendment and is plainly not "consistent with this Nation's historical tradition of firearm regulation." Thus, it is solely the government's burden to "affirmatively prove that its firearms regulation is part

2

of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S.Ct. at 2127. However, undersigned counsel is aware of no laws prohibiting private citizens from selling legally procured firearms to other private citizens, including when such firearms later travel out of state, dating from when the Second Amendment was adopted in 1791, despite the existence of fourteen states within the Union.[1]

Because the government cannot prove that § 922(a)(1)(A), as applied to Mr. Austin—who lawfully purchased, possessed, and sold guns in Arkansas—is consistent with this Nation's historical tradition, the statute violates Mr. Austin's Second Amendment rights. Mr. Austin therefore respectfully moves this Court for an order dismissing the indictment against him and granting such other and further relief as the Court deems just and proper. U.S. Const. Amends. II, V; Fed. R. Crim. Pro. 12(b).

## I.  <u>Legal Framework</u>

Adopted in 1791, the Second Amendment provides that "the right of the people to keep and bear Arms [ ] shall not be infringed." There is "no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms." *Heller*, 554 U.S. at 595. That right stands on the same footing as all enumerated constitutional rights, which "are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges

---

[1] Order of States' Admission into Union: https://www.sos.arkansas.gov/education/arkansas-history/history-of-the-flag/order-of-states-admission

think that scope too broad." *Id.* at 634-35.

In 2022, the Supreme Court invalidated the Second Circuit's existing framework for adjudicating Second Amendment challenges – known as "means-end scrutiny" – and instead gave detailed instructions on how courts should resolve such claims going forward. In *Bruen*, the Court explained that "the standard for applying the Second Amendment is as follows":

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.

142 S. Ct. at 2129–30 (internal quotation marks omitted).

The Court then identified two different classes of gun regulations, each carrying a distinct analytical approach. First, when analyzing a gun regulation directed at "a general societal problem that has persisted since the 18th century," courts are to conduct a "straightforward historical inquiry." *Id.* at 2131. Under that approach, the government bears the burden of identifying a tradition of "distinctly similar" regulations from the founding era. *Id.* at 2137-38. Relevant evidence that a modern regulation is unconstitutional includes "the lack of a distinctly similar historical regulation," earlier generations' attempts to regulate the conduct at issue "by materially different means," or the rejection of "analogous regulations" at the time of the founding. *Id.* Put differently, if "the Founders themselves could have adopted" a particular

regulation to "confront" a problem that existed in 1791, but did not do so, then that regulation is unconstitutional. *See id.*

Courts may only resort to the second type of analysis – a "more nuanced" form of "analogical reasoning" – when a challenged regulation implicates "unprecedented societal concerns or dramatic technological changes." *Id.* at 2132. Under that approach, the government must "identify a well-established and representative historical *analogue*, not a historical twin." *Id.* at 2133 (emphasis in original). But such analogical reasoning, which is arguably easier for the government to satisfy, only applies to "modern regulations that were unimaginable at the founding." *Id.* at 2132.

Here, Mr. Austin is charged under 18 U.S.C. § 922(a)(1)(A), which prohibits unlicensed "dealing in firearms" in interstate commerce. Under *Bruen's* analytical framework, it is the government's burden – and its burden alone – to identify a tradition of "distinctly" similar founding-era regulations. *See id.* Because no such historical tradition exists, prosecuting Mr. Austin under § 922(a)(1)(A) violates his constitutional rights.

## II. The Second Amendment's plain text covers Mr. Austin's alleged conduct.

"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2129-30. Here, the allegedly criminal conduct falls squarely within the Second Amendment's plain text. The legal sale of guns between private individuals is inextricably linked to those individuals' rights to possess guns.

5

Prohibiting such sales burdens the right to possession, and indeed, the fundamental right to self-defense enshrined in the Second Amendment.

Arkansas, where all of Mr. Austin's alleged conduct took place, recognizes this relationship between sale and possession. In Arkansas, gun dealers are not required to obtain a license. The private sale of guns between two individuals who are not federal firearms licensees is lawful and requires no official record or notification to the State. *See* "Gun Laws in Arkansas," EVERYTOWN FOR GUN SAFETY;[2] *see also* Ark. Code § 5-73-103. In order to violate Arkansas law as a private seller, the seller must <u>have actual knowledge that</u> the buyer fits into one of the two prohibited categories. Ark. Code § 5-73-132 (limiting gun ownership to people who are not felons or mentally ill). Such a legal framework reflects the self-evident understanding that inherent in the right to *possess* guns is the right to buy and sell them.

Moreover, in 2021, the Arkansas legislature enacted a statute specifically rejecting "[a]ll acts, laws, orders, rules and regulations of the United States Government . . . that infringe on the people's right to keep and bear arms as guaranteed by the Second Amendment." Ark. Code § 21-1-904(a)–(b). The statute lists as null and void "[a]ny registering or tracking of firearms, firearm accessories, or ammunition," and "[a]ny act forbidding the possession, ownership, use, or transfer of any type of firearm, firearm accessory, or

---

[2] *Available at* https://everytownresearch.org/rankings/state/arkansas/ (last visited Feb. 6, 2024)

ammunition by law-abiding citizens" that could "have a chilling effect on the purchase or ownership of those items by law-abiding citizens." *Id.*

Mr. Austin's alleged conduct – legally buying, possessing, and privately selling guns within the state of Arkansas – indisputably vindicates his (and others') protected right to self-defense. The firearms that Mr. Austin legally bought and sold are the type of "arm" to which the Second Amendment indisputably applies. *Heller*, 554 U.S. at 628 (D.C.'s handgun ban amounted "to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for" the lawful purpose of self-defense).

Mr. Austin, an American citizen and lifelong resident of Arkansas, is unquestionably among "the people" the Second Amendment protects. As used in the Second Amendment, "the people" "unambiguously refers to all members of the political community, not an unspecified subset." *Id.* at 580. The Court in *Heller* determined that the Second Amendment right—like the rights of "the people" in the First, Fourth, Ninth, and Tenth Amendments—"is exercised individually and belongs to *all* Americans." *Id.* (emphasis added); *see also Bruen*, 142 S. Ct. at 2156 ("The Second Amendment guaranteed to *all Americans* the right to bear commonly used arms in public subject to certain reasonable, well-defined restrictions." (emphasis added)).

Therefore, Mr. Austin's alleged conduct is plainly covered by the Second Amendment, and is "presumptively protected" on constitutional grounds.

III.    <u>**There is no historical tradition of banning private citizens from selling legally acquired guns.**</u>

Since the Second Amendment plainly protects Mr. Austin's right to privately procure, possess, and sell arms, his alleged conduct is presumptively unconstitutional. The burden therefore falls on the government to establish that § 922(a)(1)(A) "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2129–30. It will not be able to do so.

*A. Bruen's "straightforward historical analysis" test applies.*

In the 17th and 18th centuries, Great Britain established thirteen colonies along the Atlantic Coast in North America. These thirteen colonies would become the first thirteen states part of the United States of America, upon their declaration of independence in 1776. The "problem" of private citizens buying and selling guns, including guns that may travel out of the original owner's home colony or state, is not new to modern America. As such, the question of whether everyday citizens who are not licensed firearms dealers should be allowed to sell legally-purchased guns that may later travel out of state is "a general societal problem that has persisted since the 18th century." *See Bruen*, 142 S. Ct. at 2137-38.

As the Supreme Court made clear in *Bruen*, such "general societal problems" are analyzed utilizing a strict test. Rather than engaging in the "analogical reasoning" reserved for novel issues, the Court must instead conduct a "straightforward historical analysis," and the government must demonstrate a tradition of "distinctly similar historical regulation[s]" from the

8

founding era. *Id.* A "tradition" of regulation requires more than one or two
isolated examples. It instead demands a robust, "widespread" historical
practice "broadly prohibiting" the conduct in question. *Id.* Although the *Bruen*
Court did not establish what rises to the level of a "tradition," it did hold that "a
single law in a single State" is insufficient, and doubted that regulations of
three of the thirteen colonies "could suffice." *Id.* at 2142-45 (noting that the
three colonial regulations the government identified were not analogous to the
challenged New York public-carry restriction).

B. *There is no American historical tradition of regulation analogous to §
922(a)(1)(A).*

When it comes to the Second Amendment, "not all history is created
equal." *Id.* at 2136. The most relevant historical evidence is the law as it
existed at the time of the founding; "less informative" is "history from
Reconstruction to the late nineteenth century." *Range*, 53 F.4th at 274. The
Supreme Court has paid practically no attention to twentieth-century laws;
indeed, it has considered even late-nineteenth century laws to have an
unacceptable "temporal distance from the founding." *Bruen*, 142 S. Ct. at 2154.
And regardless of the historical record, the Amendment's text is always
paramount: post-ratification laws that "are inconsistent with the original
meaning of the constitutional text obviously cannot overcome or alter that
text." *Id.* at 2137 (quotations and emphasis omitted).

Although it is the government's burden – **and its burden alone** – to
prove a founding-era tradition of prohibiting private citizens from selling

9

legally-purchased guns, including those that may later be transported out of state, the simple truth is this: such regulations did not exist in the founding era.

Robert H. Churchill, a history professor at the University of Hartford, has taken "a full survey of printed session laws pertaining to gun regulation in the thirteen colonies and Vermont between 1607 and 1815." *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 LAW & HIST. REV. 139, 143 & n.11 (2007). Based on that survey, Professor Churchill concluded that "at no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic. In essence, American law recognized a zone of immunity surrounding the privately owned guns of citizens." *Id.* at 142.

In the aftermath of *Heller*, Second Amendment history and law scholar Mark Frassetto took on the monumental task of compiling a comprehensive survey of state firearms legislation from the colonial era until the start of the twentieth century. *See* Mark Frassetto, *Firearms and Weapons Legislation up to the Early 20th Century*, EVERYTOWN FOR GUN SAFETY (Jan. 15, 2013) *available at* https://ssrn.com/abstract=2200991. Frassetto's comprehensive analysis reveals no founding-era regulations prohibiting regular, private citizens from selling firearms to each other, including where those firearms

may later travel out of the jurisdiction. *Id.*

That the federal government passed the first prohibition on unlicensed interstate firearms dealing in 1968,[3] is fatal to any argument the government may make regarding a founding-era historical tradition of regulations "distinctly similar" to § 922(a)(1)(A). Those twentieth-century laws are simply insufficient to overcome the presumption of unconstitutionality that attaches to § 922(a)(1)(A). *See Bruen*, 142 S. Ct. at 2154 (treating twentieth-century regulations as carrying practically no weight in the Second Amendment analysis).

As a political matter, Americans continue to debate issues surrounding the Second Amendment. But as a legal matter, the Supreme Court has been clear: the Second Amendment means what it says, and that meaning is determined by reference to the founding era. Regular, private citizens were not barred from selling guns to other private citizens 1791, including guns that may later travel out of state, and this regulation contravenes the Second Amendment's guarantee of the "the right of the people to keep and bear Arms."

Prosecuting Mr. Austin under 18 U.S.C. § 922(a)(1)(A) violates his Second Amendment rights. The Court should therefore dismiss Counts One and Two of the indictment with respect to Mr. Austin.

---

[3] This was the Gun Control Act of 1968.

11

New York, New York
February 6, 2024

/s/_____
HANNAH McCREA
IAN MARCUS AMELKIN
Attorneys for Marquise Austin

CC:    **JANE CHONG**, **ESQ.**
         Assistant United States Attorney