UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------

UNITED STATES OF AMERICA,

                    Plaintiff,                No. 22-CR-435 (LAP)

    -against-                                 OPINION AND ORDER

MARQUISE AUSTIN,

                    Defendant.

---------------------------------------------------------------

LORETTA A. PRESKA, Senior United States District Judge:

        Before the Court are Defendant Marquise Austin's motion to

dismiss the indictment, (see dkt. no. 105), and motion to suppress,

(see dkt. no. 100).[1]  The Government opposes both motions in a

consolidated opposition brief, (see dkt. no. 115 ["Gov't Br."]),[2]

and the Court held oral argument on both of Defendant's motions on

April 3, 2024.  For the reasons set forth herein, Austin's motion

to dismiss is DENIED and his motion to suppress is DENIED.

_____

[1] In support of his motion to suppress, Austin filed a Memorandum
of Law in Support of His Motion to Suppress, dated January 22,
2024, (see dkt. no. 102 ["Def. Sup. Br."]); the Declaration of
Hannah McCrea in Support of Defendant's Motion to Suppress, dated
January 19, 2024, (see dkt. no. 101); the Declaration of Marquise
Austin in Support of His Motion to Suppress, dated January 19,
2024, (see dkt. no. 101-1 [the "Austin Decl."]); and attending
Exhibits B-G, (see dkt. nos. 101-2-101-7).  In support of his
motion to dismiss the indictment, Austin filed a Memorandum of Law
in Support of His Motion to Dismiss, dated February 6, 2024, (see
dkt. no. 106 ["Def. MTD Br."]).  Austin has filed a consolidated
Reply Memorandum of Law to the Government's Response in Opposition
to his Pretrial Motions, dated March 22, 2024, (see dkt. no. 121
["Def. Reply Br."]).

[2] In support of its opposition, the Government has submitted
Exhibits A-C, (see dkt. nos. 115-1-3).

I.   **Background**

On June 29, 2021, two agents from the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") spoke to Marquise Austin at his home in Little Rock, Arkansas about firearms purchases he had made.  (See Gov't Br. at 2.)   During the interview, Austin admitted to the two ATF agents that he had been buying and selling firearms for a profit.  (See id. at 3.)   The ATF agents provided Austin with a warning notice, entitled "Warning Notice of Unlicensed Firearms Dealing in Violation of Federal Law," which Austin read and signed.  (See id.)

On March 9, 2022, two law enforcement officers, ATF Special Agent Lennea Gordon and NYPD Detective Frederick Van Pelt (the "Officers"), came to the home in Little Rock that Austin shares with his mother, father, and younger brother.  (See Def. Sup. Br. at 1; Austin Decl. ¶¶ 2-3.)   At least one of the Officers wore a vest that read "ATF."   (See Austin Decl. ¶ 3.)   The Officers arrived at Austin's home at approximately 11:33 a.m.  (See Gov't Br. at 5.)   When the Officers arrived at the home, they were greeted by Austin's mother, who then offered to get Austin when the Officers inquired if he was home and invited the Officers into the Austin residence.  (See id. at 3.)

The Officers then began the first of two interviews they would conduct with Austin that day.  (See id. at 3-4; see also Def. Sup. Br. at 2.)   The Officers conducted the first interview primarily

in the two-car garage of Austin's home.  (<u>See</u> Austin Decl. ¶¶ 4-7.)  During this first interview, Austin was alone in the garage with the Officers.  (<u>See</u> <u>id.</u> ¶ 4.)  Austin asserts that, while the Officers questioned him during this first interview in the garage, the Officers "stood on either side of" Austin, in that one Officer stood between Austin and the door that leads from the garage to the house and the other stood between Austin and the open garage door.  (<u>Id.</u> ¶ 7-8.)  The Government contests this positioning of the Officers during the first interview, (<u>see</u> Gov't Br. at 13 n.7), but, in any event, Austin asserts that the Officers questioned him in a narrow area of the garage—which was occupied with only one car but several objects taking up space—and that he felt like he could not leave.  (<u>See</u> Austin Decl. ¶¶ 6-7, 9.)

The first interview lasted approximately from 11:33 a.m. until 12:42 p.m., during which time the Officers and Austin took two short breaks.  (<u>See</u> Gov't Br. at 5-6.)  During the first interview, the Officers questioned Austin about firearms he had purchased and sold, persons with whom he had performed firearms transactions, and where any firearms he had sold had ended up.  (<u>See</u> <u>id.</u> at 6-7; Def. Sup. Br. at 2.)  This first interview concluded after just under one hour and ten minutes.  (<u>See</u> Gov't Br. at 5.)  During the interview, the Officers never told Austin whether he was under arrest or that he was free to leave, and never informed Austin of his legal rights.  (<u>See</u> Def. Sup. Br. at 2.)

The Officers returned to Austin's home for a second interview that same day at 5:37 p.m.  (See Gov't Br. at 7.)  Upon arriving, the Officers were greeted by Austin's mother and his father.  (See id. at 7-8.)  The Officers conducted the second interview next to the car in the garage.  (See Austin Decl. ¶ 10.)  The Officers began questioning Austin again but did not read him his Miranda rights.  (See Def. Sup. Br. at 2-3.)  According to Austin, the Officers stood on either side of him while they questioned him, making him feel that he could not leave.  (See Austin Decl. ¶ 10.)  After questioning Austin for ten minutes in this second interview, the Officers told Austin that he had been talking to them on his "own free will."  (Def. Sup. Br. at 3.)  When the second interview concluded at 6:30 p.m., Officer Gordon thanked Austin for taking the time to speak with the Officers.  (See Gov't Br. at 8.)

The following day, on March 10, 2022, the Government filed a complaint against Austin in this Court.  (See dkt. no. 1.) Following the issuance of an arrest warrant, officers formally arrested Austin on March 11, 2022.  (See Def. Sup. Br. at 3.)  On August 10, 2022, a grand jury indicted Austin and three co-defendants on one count of firearms trafficking conspiracy in violation of 18 U.S.C. § 371 and one count of firearms trafficking in violation of 18 U.S.C. §§ 922(a)(1)(A), 924(a)(1) and 2.  (See

dkt. no. 16.)[3]  As relevant to the instant motions, Count Two of
the indictment charges that Austin "willfully and knowingly
engage[d] in the business of dealing in firearms in interstate and
foreign commerce" without a license and, in the course of such
dealing "shipped, transported, and received firearms in interstate
commerce" because he purchased firearms from federal firearms
licensees in Arkansas before transferring and selling some of those
firearms to co-defendant Keita and others for transfer and resale
in New York.  (Id. ¶ 4.)

On January 22, 2024, Austin filed his motion to suppress and
documents in support thereof, pursuant to which he seeks
suppression of statements he gave to the Officers in their two
interviews on March 9, 2022, because, Austin argues, the Officers
obtained those statements during custodial interrogations without
first informing Austin of his Miranda rights.  (See Def. Sup. Br.
at 1.)  On February 6, 2024, Austin filed his motion to dismiss
both counts of the indictment and documents in support thereof, on
the ground that the Count Two of the indictment—which charges
Austin with firearms trafficking in violation of § 922(a)(1)(A)—
unconstitutionally infringes Austin's right to self-defense

---

[3] The indictment also charged one of Austin's co-defendants on a
third count for transporting firearms in interstate commerce.  (See
dkt. no. 16.)  Since the grand jury returned the initial
indictment, grand juries have returned two subsequent superseding
indictments charging two additional co-defendants with engaging in
firearms trafficking conspiracy.  (See dkt. nos. 89, 118.)

protected by the Second Amendment of the Constitution.  (See Def. MTD Br. at 1-3.)   The Government filed its consolidated brief in opposition to both of Austin's motions on March 11, 2024, (see Gov't Br.), after which Austin filed a consolidated reply brief in further support of his motions on March 22, 2024, (see Def. Reply Br.).   The Court held oral argument on the motions on April 3, 2024.

## II.   **Applicable Law**

### A.   **Motion to Dismiss**

#### 1.   18 U.S.C. § 922(a)(1)(A)

The only count of the indictment that Austin challenges as unconstitutional under the Second Amendment is the count charging him under 18 U.S.C. § 922(a)(1)(A).  Section 922(a)(1)(A) makes it illegal "for any person . . . except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such business to ship, transport, or receive any firearm in interstate or foreign commerce."   18 U.S.C. § 922(a)(1)(A). Substantively, § 922(a)(1)(A) makes it a crime for a person to deal firearms if he or she does not have a license to do so.  See United States v. Mitchell, 328 F.3d 77, 80 (2d Cir. 2003).  A person is "'engaged in the business' of dealing firearms when he 'devotes time, attention, and labor to dealing in firearms . . . with the principal objective of livelihood and

profit through the repetitive purchase and resale of firearms . . . ."  United States v. Nadirashvili, 655 F.3d 114, 119 (2d Cir. 2011) (quoting 18 U.S.C. § 921(a)(21)(C)).

> 2.   Second Amendment Principles under Heller and Bruen

The Second Amendment provides:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  In District of Columbia v. Heller, the Supreme Court held for the first time that the Second Amendment confers the right to keep and bear arms upon individual, law-abiding citizens.  554 U.S. 570, 595 (2008).  Pursuant to such constitutional protection, the Supreme Court held that a Washington, D.C., statute that banned individuals from possessing handguns in their homes violated the Second Amendment because it infringed upon an individual's right to keep and bear arms for self-defense.  See id. at 635.

To reach this conclusion, the Supreme Court relied on the "natural meaning" of the "substance of the right" conferred by the Second Amendment—"to keep and bear Arms"—as it was understood at the time of the nation's founding.  Id. at 581, 584.  According to the Supreme Court, "to 'bear' mean[s] to 'carry,'" both at the nation's founding and now.  Id. at 584.  More particularly, the verb plainly means to "wear, bear, or carry upon the person or in the clothing or in a pocket, for the purpose of being armed and

ready for offensive or defensive action in a case of conflict with another person." Id. (cleaned up) (internal quotations and citations omitted). Thus, at the time of the founding, bearing arms would "unambiguously [be] used to refer to the carrying of weapons outside of an organized militia." Id. Similarly, to "'[k]eep arms' was simply a common way of referring to possessing arms, for militiamen and everyone else." Id. at 583 (emphasis in original).

Pursuant to this "natural" understanding of the rights protected by the plain text of the Second Amendment, the Supreme Court held that the District of Columbia's total ban on handgun possession in the home was unconstitutional. See id. at 582-84, 635.

However, in its decision, the Supreme Court noted that "the right secured by the Second Amendment is not unlimited." Id. at 626. The Court specifically noted that "nothing in [the] opinion should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms." Id. at 626-27. In his concurrence in N.Y. State Rifle & Pistol Assoc., Inc. v. Bruen, Justice Kavanaugh reiterated the Heller holding that the Second Amendment does not prohibit conditions or regulations on commercial firearm dealing. See 597 U.S. 1, 80-81 (2022) (Kavanaugh, J., concurring) (noting "the Second Amendment

allows a 'variety' of gun regulations" (quoting Heller, 554 U.S. at 636)).

After Heller and the Supreme Court's subsequent decision in McDonald v. City of Chicago, Ill., 561 U.S. 742 (2010), the Courts of Appeals developed a "'two-step' framework for analyzing Second Amendment challenges that combine[d] history with means-end scrutiny." N.Y. State Rifle & Pistol Assoc., Inc. v. Bruen, 597 U.S. 1, 17 (2022). The Supreme Court rejected this two-step inquiry in Bruen. Instead, in Bruen, the Supreme Court articulated a new two-part standard pursuant to which courts must assess Second Amendment challenges. Id.

First, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." Id. If the government establishes that the plain text of the Second Amendment does not cover the defendant's conduct, the inquiry stops there—the conduct is "categorically unprotected" by the Second Amendment. Id. at 18. However, if—and only if—the Second Amendment's text facially covers the individual's conduct, then the Court proceeds to the second step, under which "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." Id. at 17. The Court may only conclude that the individual's conduct is unprotected by the Second Amendment if the firearm regulation in question is "consistent with this Nation's historical

tradition[.]" Id. The Bruen analysis thus "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." Id. at 26.

In sum, under Bruen, courts must first analyze whether the plain text of the Second Amendment covers the conduct regulated by the modern firearm statute and, if so, then determine whether there are historical analogues to the statute that justify the firearm restriction imposed by the statute.

**B.   Motion to Suppress**

The Fifth Amendment requires that the prosecution "may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda v. Arizona, 384 U.S. 436, 444 (1966). Those necessary safeguards include warning the defendant that he has "a right to remain silent, that any statement [the defendant] does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." Id.

Pursuant to this rule, "[s]tatements made during a custodial interrogation are generally inadmissible unless a suspect has first been advised of his or her rights" as required by Miranda. United States v. Faux, 828 F.3d 130, 134 (2d Cir. 2016). However, "Miranda's warning requirements apply only to 'custodial

interrogation.'"   United States v. Newton, 369 F.3d 659, 669 (2d Cir. 2004).   This requires the Court to suppress statements made without the necessary Miranda warnings only if the suspect was (a) actually interrogated (b) "while 'in custody.'"   Tankleff v. Senkowski, 135 F.3d 235, 242 (2d Cir. 1998) (citing Thompson v. Keohane, 516 U.S. 99, 100-01 (1995)).

"The test for determining custody is an objective inquiry that asks (1) 'whether a reasonable person would have thought he was free to leave the police encounter at issue' and (2) whether 'a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest.'" Faux, 828 F.3d at 135 (quoting Newton, 369 F.3d at 672).   Although the Court must assess both elements of this objective inquiry, the second—the objective understanding of whether the defendant's freedom was curtailed to a degree associated with a formal arrest— is the "'ultimate inquiry' because a 'free-to-leave inquiry reveals only whether the person questioned was seized,'" which is a level of restriction distinct from custody.   Id. (quoting Newton, 369 F.3d at 672).   Relevant considerations the Court must take into account when making this "ultimate inquiry" include:   "(1) the interrogation's duration; (2) its location (e.g., at the suspect's home, in public, in a police station, or at the border); (3) whether the suspect volunteered for the interview; (4) whether the officers used restraints; (5) whether weapons were present and

especially whether they were drawn; and (6) whether officers told the suspect he was free to leave or under suspicion." Id. (cleaned up) (citing United States v. FNU LNU, 653 F.3d 144, 153 (2d Cir. 2011)).    Other relevant factors include the "location and atmosphere" of the interrogation, the "language and tone" used by law enforcement officers, and "whether the suspect is searched, frisked, or patted down."  Tankleff, 135 F.3d at 244.

**III.   Discussion**

    **A.   Motion to Dismiss**

The Court concludes that the conduct regulated by 18 U.S.C. § 922(a)(1)(A) and for which Austin has been indicted is not covered by the plain text of the Second Amendment.  The Court is unaware of any challenges to the constitutionality of § 922(a)(1)(A) in any court in this District or in the Second Circuit since the Supreme Court issued its decision in Bruen. However, in reaching its conclusion as to Mr. Austin's constitutional challenge, the Court relies on the recent decision in United States v. Libertad, 2023 WL 4378863 (S.D.N.Y. July 7, 2023), in which Judge Rakoff addressed a constitutional challenge to a different subsection of the same statute, as well as the recent decisions of district courts which have had occasion to determine the constitutionality of § 922(a)(1)(A).  The analyses in each of those decisions leads this Court to find that, because § 922(a)(1)(A) does not regulate conduct covered by the plain text

of the Second Amendment, it withstands constitutional scrutiny under Bruen and Heller. Accordingly, Mr. Austin's motion to dismiss is denied.

### 1. Second Amendment Challenges to § 922(a)(1)(A)

Although no court in the Southern District of New York or in the Second Circuit has yet analyzed the constitutionality of § 922(a)(1)(A) in the wake of Bruen, several district courts around the country concluded that the conduct regulated by the statute is beyond the reach of the plain text of the Second Amendment.

In United States v. King, the Eastern District of Pennsylvania denied the defendant's motion to dismiss the indictment filed against him because the conduct he was alleged to have engaged in—commercial sale of firearms without a license—is "not protected by the plain text of the Second Amendment." 646 F. Supp. 3d 603, 607 (E.D. Pa. 2022). The defendant in King was indicted for a single count of dealing firearms without a license in violation of § 922(a)(1)(A). Id. at 605. He had argued that buying and selling firearms is protected by the Second Amendment "because it is an inescapable pre-condition of keeping and bearing arms" which confers an "implicit" constitutional right to buy and sell arms. Id. at 607 (cleaned up). The court summarily rejected this argument because, under Bruen, a court can look only to "the Second Amendment's plain text" to determine if it covers the conduct alleged in the indictment. Id. A court may not engage in the

second step of the <u>Bruen</u> standard—analysis of historical analogues—if the alleged conduct involves "'implicit' rights that may be lurking beneath the surface of the plain text" of the Second Amendment.  <u>Id.</u>

The court clarified further in <u>King</u> that, <u>even if</u> the Second Amendment protected the "implicit" right to buy and sell firearms "in order to keep and bear arms," that protection does not extend to protect the "<u>commercial</u> dealing of firearms." <u>Id.</u> (emphasis in original).  In other words, even if one could construe the plain text of the Second Amendment to protect the right to buy and sell firearms because such conduct is a necessary precondition to keeping and bearing firearms, which <u>is</u> facially protected conduct, it would be a step too far to conclude that the Second Amendment's plain text protects conducting firearm transactions "with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms." <u>Id.</u> Such commercial dealing is not conducted to further the facially protected right to keep and bear arms "for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person." <u>Id.</u> (citing <u>Bruen</u>, 597 U.S. at 32).  Thus, the court concluded in <u>King</u>, because the defendant's alleged conduct of engaging in the commercial sale of firearms without a license is not protected by the Second Amendment's plain text, § 922(a)(1)(A) does not violate the Second Amendment.  <u>See</u> <u>id.</u>

14

The Southern District of Texas reached a similar conclusion in United States v. Flores, 652 F. Supp. 3d 796 (S.D. Tex. 2023). As did the defendant in King and as Austin does in the instant case, the defendant in Flores argued that Bruen required the court to dismiss his indictment for unlicensed commercial firearms dealing in violation of § 922(a)(1)(A). United States v. Flores, 652 F. Supp. 3d 796, 797-99 (S.D. Tex. 2023).

The court employed a reasoning similar to the one applied in King. In Flores, the court noted that the defendant "d[id] not explain how selling guns at wholesale or retail fits within" the "natural" meaning of the Second Amendment right to "keep and bear arms," as the Supreme Court had interpreted such meaning in Heller. Id. at 800 (quoting Heller, 554 U.S. at 582-84). The court found nothing in the plain text of the Second Amendment that protected such commercial sales of firearms. See id. at 800-01.

As did the court in King, the court in Flores rejected the defendant's argument that there exists an implied constitutional "right to freely purchase and sell the firearms citizens are constitutionally entitled to possess" under the plain text of the Second Amendment. Id. at 801. The court concluded that there is not, by "logical necessity," a "right to commercially deal in firearms" simply because the Second Amendment provides a constitutional right to keep and bear firearms. Id. at 802. Relying on Heller, the court noted that the Second Amendment's

15

protection of the right to keep and bear arms did not "cast doubt" on "presumptively lawful" laws that "'impos[e] conditions and qualifications on the commercial sale of arms.'"  Id. (quoting Heller, 554 U.S. at 626-627, 627 n.26).  Thus, the Court reached the same conclusion as the one reached by the court in King: because the Second Amendment neither facially protects commercial firearm dealing by its plain text nor creates an implicit right to such conduct, the commercial firearm dealing regulated by § 922(a)(1)(A) does not violate the Second Amendment.  Id. at 804.

Finally, in United States v. McNulty, the District of Massachusetts found "itself unable to escape the conclusion" that the plain text of the Second Amendment does not cover commercial dealing of firearms regulated by § 922(a)(1)(A) sufficient to implicate the Second Amendment under Bruen.  2023 WL 4826950, at *4 (D. Mass. July 27, 2023).  According to the court, whatever protection the Second Amendment extends to "firearm commerce, if any such protection exists, is qualified."  Id. at *5 (emphasis added).  Relying on Heller, the court noted that certain "longstanding laws" placing qualifications on commercial firearm dealing are considered "presumptively constitutional and outside the scope of Second Amendment protections."  Id. (citing Heller, 554 U.S. at 626-27).  Because of the presumptive constitutionality of qualifications on commercial firearm dealing, § 922(a)(1)(A)'s prohibition of unlicensed firearm dealing does not even implicate

the protections provided by the Second Amendment, even after Bruen.
See id. Thus, the court concluded, because the Second Amendment's
plain text did not cover commercial firearm dealing, the court was
not required even to reach the historical analogy analysis step
under the Bruen standard.  See id.

2. Post-Bruen Analysis in Libertad

In United States v. Libertad, the defendant moved to dismiss
the indictment filed against him because 18 U.S.C. § 922(a)(3),
under which he had been charged, infringed his Second Amendment
right to keep and bear arms.  2023 WL 4378863, at *1-2 (S.D.N.Y.
July 7, 2023).  Section 922(a)(3), which is of course a subsection
of the same statute under which Austin has been charged in the
instant case, makes it unlawful

> 'for any person, other than a licensed importer, licensed
> manufacturer, licensed dealer, or licensed collector to
> transport into or receive in the State where he
> resides . . . any firearm purchased or otherwise
> obtained by such person outside that State, except'
> where the person receives the firearm by bequest or meets
> certain other narrow criteria.

Id. at *1 (quoting 18 U.S.C. § 922(a)(3)).  Thus, as subsection
(a)(1)(A) prohibits the unlicensed importing, manufacturing, or
dealing of firearms in interstate or foreign commerce, subsection
(a)(3) prohibits anyone without a license from bringing firearms
into the state.  It thus performs a function ancillary to the one
performed by subsection (a)(1)(A):  "funnel[ing] access to
firearms almost exclusively through dealers licensed and regulated

17

by the Bureau of Alcohol, Tobacco, Firearms, and Explosives[.]"
Id. (internal quotations and citations omitted).

The court in Libertad held that "'the regulated conduct
[implicated by § 922(a)(3)] falls beyond the [Second] Amendment's
original scope'" because the statute "'only minimally affects the
ability to acquire a firearm[.]'"  Id. at *3 (quoting Bruen, 597
U.S. at 18, and United States v. Decastro, 682 F.3d 160, 164 (2d
Cir. 2012)).  The statute does not facially "operate to prevent
anyone from keeping or bearing arms" but to "prescribe[] and
proscribe[] particular modes of acquiring guns" to ensure they are
acquired by law-abiding citizens, which renders it presumptively
lawful on its face.  Id. at *4 (citing Bruen, 597 U.S. at 38 n.9).
Accordingly, because the statute's regulation of transporting
firearms across state lines does not "on its face infringe the
right to keep and bear arms" protected by the plain text of the
Second Amendment, it does not trigger Second Amendment scrutiny
demanded by Bruen and Heller.  Id. at *3.

    3. Application

Although no court in this District or in the Second Circuit
has determined the constitutionality of § 922(a)(1)(A) since the
Supreme Court's decision in Bruen, the Court finds each of the
cases above persuasive.  The thorough analysis each court applied
leads this Court to the inescapable conclusion that the plain text
of the Second Amendment does not cover or protect conduct regulated

18

by § 922(a)(1)(A) or the conduct that Austin is charged with engaging in.  Because the Second Amendment's text does not protect such conduct, it is "categorically unprotected" by the Constitution.  <u>Bruen</u>, 597 U.S. at 18.

The plain text of the Second Amendment guarantees only the right of individuals to "keep and bear arms," which is to be interpreted according to its "'normal and ordinary' meaning."  <u>See id.</u> at 17, 20 (quoting <u>Heller</u>, 554 U.S. at 576-77).  The normal meaning of the Second Amendment's text provides only an individual's right to "possess[] arms" and to "wear, bear, or carry" such firearms "for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person."  <u>Heller</u>, 554 U.S. at 583-84.  Austin has not been indicted for such activity.  Instead, Austin has been indicted for unlicensed <u>dealing</u> of firearms in interstate commerce by purchasing them from licensed dealers before selling them to a co-defendant who then transferred them from Arkansas to New York, and the statute under which he has been indicted regulates such unlicensed dealing where the dealer's "principal objective [is] livelihood and profit."  (<u>See</u> dkt. no. 16 ¶ 4); <u>see also Nadirashvili</u>, 655 F.3d at 119.

The unlicensed commercial sale of firearms for profit, for which Austin has been indicted and which § 922(a)(1)(A) prohibits, is not "inextricably linked" to the constitutionally protected

right to possess and carry firearms for self-defense, as Austin
suggests.  (Def. MTD Br. at 5.)  Nor does Austin's private selling
of guns "vindicate[] his (and others') protected right to self-
defense" that is guaranteed by the Second Amendment.  (Id. at 7.)

    As the court stated in King, pursuant to Bruen, a court faced
with a Second Amendment challenge may not even analyze a statute's
historical analogues if the defendant's alleged conduct involves
"implicit rights" that may "lurk[] beneath the surface of the plain
text" of the Second Amendment, rather than conduct protected by
the plain text itself.  King, 646 F. Supp. 3d at 607.  Or, to put
it in the terms Austin urges, the Court may not engage in
historical analysis of a statute that regulates conduct that is
merely "linked" to the rights facially protected by the Second
Amendment, rather than one that regulates conduct that is clearly
protected by its plain text.

    And, even if the Court were required to analyze the
constitutionality of regulations of certain conduct "linked" to
keeping and bearing firearms, that analysis is not required for
the "commercial dealing of firearms," which the Second Amendment's
plain text certainly does not protect because the "principal
objective" of such dealing is "livelihood and profit," rather than
possession and carriage for self-defense.  Id. at 607 (emphasis in
original); see also Heller, 554 U.S. at 626-27 (noting the
presumptive constitutionality of "laws imposing conditions and

qualifications on the commercial sale of firearms"). Indeed, it is not a "logical necessity," as Austin would have it, that the Second Amendment provides a "right to commercially deal in firearms" due to the Second Amendment's provision of a right to keep and bear them. Flores, 652 F. Supp. 3d at 802 (emphasis added). Such an interpretation would transform the protection afforded by the plain text of the Second Amendment from the right to possess and carry firearms for self-defense, as recognized by the Supreme Court, see Bruen, 597 U.S. at 8-10, into a constitutional right to turn a profit on firearms dealing without condition or qualification. There is no such unqualified right protected by the Second Amendment, either by its plain text or by implication. See Flores, 652 F. Supp. 3d at 802; see also McNulty, 2023 WL 4826950, at *5.

To whatever extent the Second Amendment does protect dealing firearms, if any, such protection is nonetheless subject to "presumptively constitutional" laws that "impose conditions and qualifications on the commercial sale of firearms," including § 922(a)(1)(A). McNulty, 2023 WL 4826950, at *5. Statutes such as § 922(a)(1)(A) are presumptively constitutional because they "generally do not infringe the right to keep and bear arms so long as they are not applied to actually prevent law-abiding citizens from obtaining and carrying guns," the right protected by the Second Amendment's plain text. Libertad, 2023 WL 4378863, at *3

(emphasis in original).  Thus, even if the conditions and qualifications required by § 922(a)(1)(A) impose some downstream "burden[] [on] the fundamental right to self-defense protected by the Second Amendment," (see Def. MTD. Br. at 2), Austin has not shown that such a burden has actually <u>infringed</u> any individual's constitutional right to self-defense protected by the Second Amendment.  See <u>Libertad</u>, 2023 WL 4378863, at *3 ("any number of regulations may incidentally, minimally, or not substantially burden the exercise of a right without being considered to actually 'infringe' it").  Specifically, he has not shown that § 922(a)(1)(A) or his prosecution pursuant to the statute has "operate[d] to prevent anyone from keeping or bearing arms." <u>Id.</u> at *4.  Because Austin has provided the Court no reason to conclude that the regulation of his conduct has "substantially interfere[d] with the right of 'law-abiding, responsible citizens' to obtain and carry firearms" for their self-defense, he has failed to show that the indictment has infringed any individual's right protected by the plain text of the Second Amendment.  <u>Id.</u> (quoting <u>Bruen</u>, 597 U.S. at 38 n.9).

Accordingly, the Court finds that the conduct for which Austin was indicted under § 922(a)(1)(A) is not protected by the plain text of the Second Amendment.  Because the Second Amendment does not protect such conduct, the Court denies Austin's motion to dismiss the indictment.

**B.   Motion to Suppress**

Upon analysis of the factors the Court must consider in the "ultimate inquiry" of whether Austin was restricted to a degree associated with a formal arrest, <u>see</u> <u>Faux</u>, 828 F.3d at 135, the Court concludes that Austin was not in custody when the Officers questioned him in his home garage on March 9, 2022.  Accordingly, the Officers were not required to inform Austin of his rights under <u>Miranda</u>, and the Court denies Austin's motion to suppress the statements he made to the Officers that day.

The Court of Appeals has held that an interrogation in the "familiar surroundings of [a defendant's] home" weighs against a finding of custody.  <u>See</u> <u>id.</u> at 138 (citing <u>FNU LNU</u>, 653 F.3d at 153).  As the Government notes in its opposition brief, courts "rarely conclude . . . that a suspect questioned in her own home is 'in custody'" absent any formal arrest.  <u>Id.</u> at 135-36.  When the Officers questioned him, Austin was in the garage of his parents' house, where he resided.  (<u>See</u> Austin Decl. ¶¶ 2, 4-10.) Indeed, at the outset of the first interview, Officer Gordon said the Officers wanted to interview Austin wherever he would be comfortable.  (<u>See</u> Gov't Br. Ex. C.)  Because Austin was interviewed in the "familiar surroundings of [his] home," this factor cuts against a finding that he was in custody.  <u>Faux</u>, 828 F.3d at 138.

23

The length of the Officers' questioning of Austin similarly weighs against suppressing the statements he made to them on March 9, 2022.  That day, the two Officers questioned Austin at his home two separate times—one for just over one hour and the second for fifty-three minutes.  (See Def. Sup. Br. at 2; Gov't Br. at 5, 7-8.)  Even if the Court considers the two interviews together as a single interrogation that lasted approximately two hours, the Court cannot conclude that the length of the interrogation supports a conclusion that Austin was in custody when it occurred.  The Court of Appeals has previously held that a defendant was not in custody when he or she was subject to an interview of this length—or even longer—that occurred in his or her home.  See, e.g., Faux, 828 F.3d at 137-38 (finding defendant was not in custody even where she was "not permitted to move freely about her home during the two-hour interrogation"); see also United States v. Badmus, 325 F.3d 133, 139 (2d Cir. 2003) (concluding defendant was not in custody when agents were in his home for nearly three hours).  This factor likewise weighs against concluding Austin was in custody.

The language and tone the Officers used also support a conclusion that Austin was not in custody when the Officers questioned him.  After the Officers greeted Austin's mother upon entry into Austin's home, Officer Gordon introduced herself to Austin and asked him how he was doing.  (See Gov't Br. Ex. C.)  After Officer Gordon told Austin the Officers had follow-up

24

questions from the interview other ATF agents had previously conducted with Austin on June 29, 2021, she told Austin she appreciated that he was taking the time to speak with the Officers. (See id.)  After the Officers concluded a portion of their initial questioning, Officer Gordon told Austin that she appreciated Austin's assistance.  (See id.)  The Officers and Austin exchanged lengthy comments on the weather, particularly the contrast between the weather in Little Rock and New York.  (See Gov't Br. at 7.) Austin even offered the Officers tourist sites they should visit while in Arkansas.  (See id.)  Finally, the cordial tone of voice the Officers demonstrated on the tapes of the interview dispels any doubt about the tone of the interview.  (See Def. Sup. Br. Exs. B-E.)

These examples, which are by no means exhaustive, illustrate that the Officers' language and questions reflect a cordial, calm demeanor.  The use of such language does not support a conclusion of an objective restraint of a degree associated with a formal arrest.  See Faux, 828 F.3d at 139 ("largely conversational" tone of questioning by officers supported conclusion that defendant was not in custody).

Although the Officers told Austin at one point that they "already kn[e]w the answers" to some of the questions they posed and cautioned him that "lying to a federal agent is a crime," (see Def. Sup. Br. at 2), the context of their questions indicates that

these more assertive comments were not so "accusatory and confrontational" to indicate that Austin was not free to choose not to answer such questions, (see id. at 6). Indeed, in the minutes immediately before and immediately after making those comments to Austin, the Officers told him they did not want him to tell them something if he did not want to answer and that they understood he was seeking to protect himself when he answered their questions. (See Gov't Br. Ex. C.) Thus, given the immediate context of the Officers' statements, as well as the broader context of the informal and cordial tone with which the Officers conducted the interviews, the Officers' more assertive comments do not undercut the conclusion that the language they used during the interrogation does not support a finding that Austin was in custody.

The Officers did not explicitly inform Austin he was free to leave or tell him whether he was under arrest until one of them said, ten minutes into the second interview, that Austin had been "talking to [the Officers] of [his] own free will." (Gov't Br. at 14.) However, explicitly informing Austin that his participation in the interrogation was voluntary is not necessary to make it so. See, e.g., Faux, 828 F.3d at 134 (defendant was not in custody even though law enforcement officers "never specifically informed [her] that her participation was voluntary, that she did not have to answer questions, or that she was free to

26

leave"). Further, at no point in either the first or second portion of the interrogation did the Officers formally place Austin under arrest or inform him that he was under arrest. In addition, Austin never indicated during either interview that he was not responding to the Officers' questions voluntarily, and the Officers did not tell Austin his responses were required. In fact, at one point during the first interview, agent Gordon indicated to Austin that if Austin did not want to answer her questions, she did not want him to. (See Gov't Br. Ex. C.)

Therefore, although the Officers waited until ten minutes into the second interview to inform Austin that he was speaking to them on his own "free will" and never explicitly said Austin was not under arrest, the circumstances of the interrogation demonstrate that Austin could "reasonably be expected to . . . understand[] . . . that he was not about to be removed from his home" in a manner that a reasonable person would believe constituted a formal arrest. Faux, 828 F.3d at 138 (internal quotations and citations omitted). Although, by the Court's estimation, the Officers only made the "free will" comment after approximately one hour and nineteen minutes of total questioning, they had already left Austin's home for nearly five hours before returning for their second round of questioning. (See Def. Sup. Br. at 2-3; Gov't Br. at 5-7.) The Officers' departure from Austin's home after over an hour of initial questioning, before

27

returning to his home for further questioning, is not conduct that a reasonable person would reasonably understand as a restriction of personal freedom on par with a formal arrest.  The Officers' departure and subsequent statement in the second round of interviewing that Austin was speaking to them on his own "free will" is incongruent with any objective perception of a formal arrest.

Austin does not contend that the Officers drew, unholstered, or displayed their weapons, that they used any restraints, or that they patted down, searched, or frisked him during either of the two interviews.  The Government explicitly contends the Officers took no such actions during either interview.  (See Gov't Br. at 10, 12.)  The absence of such actions weighs against a finding of suppression.  See FNU LMU, 653 F.3d at 155 (evidence that law enforcement never drew their weapons or used physical restraints supported conclusion that defendant was not in custody).

To support the proposition that he did not feel free to leave the interviews with the Officers, Austin contends that the Officers questioned him while he was "confined" in a "space of a garage while the agents blocked the exits" and "sandwich[ed] him between the car and the other items in the garage."  (Def. Sup. Br. at 2, 6.)   Specifically, Austin avers that "while the officers . . . question[ed]" him in the garage, "they stood on

28

either side of [him].  One officer stood between [Austin] and the door to the house and the other stood between [Austin] and the open garage door," which, in Austin's view, "meant that [he] would have had to get past one of them, in a narrow area, in order to leave the garage."  (Austin Decl. ¶ 8.)  According to Austin, the Officers' positions on either side of him, "blocking [his] access to the doors, made [him] feel like [he] could not leave." (Id. ¶ 9.)

The Government disputes Austin's characterization of the Officers' positioning in his garage during their interrogation. (See Gov't Br. at 13 n.7.)  Even taking his account as true, however, it "is insufficient to overcome the objective facts discussed above."  United States v. Gomez, 199 F. Supp. 3d 728, 747, 749 (S.D.N.Y. 2016) (finding objective factors under Faux outweighed defendant's subjective belief that he could not leave based on defendant's contention that a law enforcement officer "blocked [defendant's] path to his vehicle" while another officer "stood close to [him] with his hand on his gun holster").  Among other things, the Court notes that there was only one car parked inside the Austin family's two-car garage and that the garage door was open throughout both interviews.  (See Austin Decl. ¶¶ 5-7.) The "ultimate inquiry," again, is determining whether a reasonable person would have understood the restrictions to be those typically associated with a formal arrest.  Faux, 828 F.3d at 135.  Each of

the factors outlined in Faux weighs against such a finding, and, even if the Officers physically blocked access to either of the exits in the garage—which the Government disputes—the totality of the circumstances, particularly the questioning in Austin's own garage with the garage door open, does not yield to Austin's subjective perception of the interrogation.  See Stansbury v. California, 511 U.S. 318, 323 (1994) ("the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by . . . the person being questioned").

Accordingly, even crediting for the purpose of this motion Austin's assertion about his subjective perception of the interrogation, his perception cannot overcome the undisputed facts that the location, duration, and atmosphere of the interrogation, the tone and language the Officers used during the interrogation, the lack of any physical restraints or display of weapons, and the seemingly voluntary nature of the interrogation cannot support a conclusion that Austin was objectively restrained to a degree associated with a formal arrest.  Therefore, he was not "in custody" during the interrogation, and the Officers were not required to read him his Miranda rights.  See Faux, 828 F.3d at 134-35, 139; Tankleff, 135 F.3d at 242.  Because he was not in custody, the Court denies Austin's motion to suppress the

statements he made to the Officers during his interrogation on March 9, 2022. See <u>Tankleff</u>, 135 F.3d at 242, 245.

IV.     **<u>Conclusion</u>**

        For the reasons set forth above, the Court denies Austin's motion to dismiss the indictment and denies Austin's motion to suppress.  The Clerk of the Court shall close docket entry numbers 100 and 105.

**SO ORDERED.**

Dated:     April 11, 2024
           New York, New York

                         _____
                         LORETTA A. PRESKA
                         Senior United States District Judge